NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (CBN 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
    312 North Spring Street, 14th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-6166
    Facsimile: (213) 894-0142
    E-mail: Steven.Welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>$716,140.00 IN U.S. CURRENCY,<br><br>    Defendant. | NO. 2:19-CV-4947<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>[21 U.S.C. 881(a)(6)]<br><br>[D.E.A.] |

    The United States of America brings this claim against the defendant $716,140.00 in U.S. currency ("defendant currency"), and alleges as follows:

## JURISDICTION AND VENUE

    1.    This is a civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(6).

1


2. This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendants are:
   a. $83,010.00 in U.S. currency seized on January 3, 2019, from Kelvin Jackson in Van Nuys, California;
   b. $89,320.00 in U.S. currency seized on January 3, 2019, from Sunny Patel in Van Nuys, California;
   c. $105,950.00 in U.S. currency seized on January 3, 2019, from Allen Feldman in Van Nuys, California; and,
   d. $437,860.00 in U.S. currency seized on January 3, 2019, from Michael Huang in Van Nuys, California.

6. The interests of Kelvin Jackson ("Jackson"), Sunny Patel ("Patel"), Allen Feldman ("Feldman") and Michael Huang ("Huang") may be adversely affected by these proceedings.

7. The defendant is in the custody of United States Marshals Service, where it shall remain subject to this court's jurisdiction during the pendency of this action.

## FACTS SUPPORTING FORFEITURE

8. During the early afternoon of January 3, 2019, members of the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, High Intensity Drug Trafficking Area ("HIDTA") Task Force, together with members of the Hawthorne Police Department, Homeland Security Investigations and Montebello Police Department, were conducting interdiction operations at the Van Nuys, California airport.

9. At approximately 1:58 p.m., a private chartered flight arrived at the Van Nuys airport. A California Highway Patrol canine officer deployed the canine to conduct a narcotic sniff of all the luggage on the airplane, which had been unloaded and placed in a line several feet apart from each other. Canine Nero, a sophisticated drug detection canine, conducted a narcotic sniff of the luggage and made a positive alert to the odor of narcotics on or from five of the eleven pieces of luggage, indicating that the individual bags or their contents either were controlled substances, or had been in close recent proximity to controlled substances. Those five pieces of luggage belonged to Kenneth Yea ("Yea"), Feldman, Huang, Patel and Jackson.

Interview of Yea

10. Agents approached Yea as he was exiting the airplane and informed him that they were members of law enforcement investigating the transportation of large amounts of drug proceeds, guns, drugs and other illegal items. Agents asked Yea if they could search his carry-on luggage and Yea consented. Yea's carry-on luggage was placed on the ground where Nero conducted a narcotic sniff of the luggage, resulting in a positive alert.

11. Inside Yea's carry-on luggage, agents found several large vacuum sealed bags, each with a clear side and a black side, containing different amounts of currency. The vacuum sealed bags were located inside separate manila envelopes. Agents asked Yea how much currency he was carrying and why he had such a large amount. Yea was unsure how much currency he had but stated that it was approximately $300,000.00. The currency was later counted and totaled $342,020.00.

12. During a subsequent consensual interview, Yea stated that he was an investor for land in the northern California area and planned on being a silent investor in land that would be utilized to grow marijuana. Agents asked Yea if the currency belonged to him and how he obtained it. Yea stated that he obtained a

portion of the currency from illegal gambling. When asked if he was employed, Yea stated that he was not, but his family had a nail salon and a deli in New Jersey. Yea further stated that he did not receive a paycheck from his family.

13. Based on the large amount of currency in Yea's luggage, agents asked if he had anything on his person. Yea stated that he had more cash in his pockets. A search of Yea's person revealed an additional $67,280.00 in individually wrapped bundles. All of the currency was seized. Following the seizure, administrative forfeiture proceedings were commenced against the currency seized from Yea. No claims were received in those proceedings, and the time for filing such claims has expired.

<u>Interview of Feldman</u>

14. Agents approached Feldman as he was exiting the airplane and informed him that they were members of law enforcement investigating the transportation of large amounts of drug proceeds, guns, drugs and other illegal items. The agents asked Feldman if he would speak with them and agree to a search of his property. Feldman's immediately became very pale and he fell to the ground, but remained conscious. While lying on the ground, Feldman stated that he fainted because he was nervous. Agents called for medical assistance and, after speaking with paramedics, Feldman was cleared to be interviewed and refused any further medical treatment.

15. During a subsequent consensual interview, agents asked Feldman if he had anything illegal, including large amounts of cash. Feldman stated that he had approximately $12,000.00. He then changed his story several times stating that he had $30,000.00, then $50,000.00 and, finally, $60,000.00. Feldman consented to the search of his property.

16. During the search of Feldman's property, agents found $75,950.00 in numerous pockets of his jacket and backpack. Agents also found an additional $30,000.00 in Feldman's suitcase. When asked about the large amount of currency

found, Feldman stated that the money was from the sale of a high end watch. He was unable to provide the name of the person to whom he had sold the watch. When asked if he was supposed to give the money to anyone, Feldman admitted that he was supposed to give the money to someone but was not sure to whom.

<u>Interview of Huang</u>

17. While agents were interviewing another passenger, an officer noticed Huang eavesdropping on the conversation. The officer approached Huang and asked if he was in possession of any weapons or illegal contraband on his person or luggage. Huang admitted that he was in possession of a small amount of Xanax and cocaine. He retrieved two small baggies from his wallet and handed them to the officer. One of the bags contained one half of a Xanax pill and the other contained approximately one gram of a substance that appeared to be cocaine. Huang stated that he uses Xanax when he flies and that he was going to use the cocaine in Las Vegas, Nevada.

18. Agents informed Huang that they were members of law enforcement investigating the transportation of large amounts of drug proceeds, guns, drugs and other illegal items. Huang immediately stated that he had approximately $100,000.00 in his backpack that he intended to gamble with in Las Vegas. When asked at which hotel he would be staying, Huang, after a long pause, stated "well, I may to go Vegas." Huang then stated that he had a business that sold Cannabidiol ("CBD") water and he was planning on staying in the area for several weeks.

19. Agents asked Huang if they could search his backpack, to which Huang consented. Agents found $167,950.00 inside a FedEx bag with what appeared to be Chinese writing believed by the agents to translate to "sugar."[1] Agents told Huang that his backpack would be placed on the ground along with

---

[1] It is common for narcotics traffickers to utilize words such as "sugar," which is code for cocaine or methamphetamine, to attempt to thwart law enforcement from detection.

other bags so that officers could utilize a drug detecting canine to conduct a narcotic sniff of the bags. Huang's backpack was placed on the ground along with other bags. Nero conducted a narcotic sniff of all the bags and made a positive alert to Huang's backpack and a duffel bag that also belonged to Huang. When asked about the duffel bag, Huang stated that he had money in it but did not know how much. Agents asked Huang if the money in the duffel belonged to him and Huang stated that he could not answer that question.

20. When agents began to unzip the duffel bag when Huang stated that he did not want the agents searching his bag, at which point the search concluded. Huang stated that he did not want to wait and left the airport. Agents obtained a search warrant signed by the Honorable Margaret Bernal, Los Angeles County Superior Court, for Huang's duffel bag. Upon searching the duffel bag, agents found an additional $269,910.00, which was vacuum sealed and concealed by clothing.

Interview of Patel

21. Upon exiting the airplane, Patel entered the airport lobby. Agents approached him and asked if he would speak with them outside. Patel agreed to speak with the agents. Once outside, the agents told Patel that a drug detecting canine had altered to his luggage. Patel stated that he was not sure why that would happen since he did not have any drugs in the luggage. When asked if he had anything illegal in his luggage or a large amount of currency, Patel stated that he had approximately $70,000.00. Agents asked Patel if he would consent to a search of his luggage, and Patel agreed.

22. During the search of Patel's luggage, agents found $89,320.00. Patel stated that he was planning on purchasing property in the northern California area. Agents asked Patel why he didn't go to northern California and instead flew to southern California. Patel stated that he planned on taking an Uber to northern California. When told that his story did not make sense, Patel admitted that he was

being paid to transport the money for someone in New Jersey. Patel stated that he was chosen because he had a membership with the private airline company. Patel further stated that he was being paid five percent of the amount he was transporting, and that he had made three similar trips prior this one. Patel was unable to provide the names of the person he was transporting the currency for or to whom the currency would be delivered. Patel signed a disclaimer of ownership for the currency.

<u>Interview of Jackson</u>

23. Upon exiting the airplane, Jackson entered the airport lobby. Agents approached him and asked if he would speak with them outside. Jackson agreed to speak with the agents. Once outside, agents told Jackson that a drug detecting canine had alerted to his luggage. When asked if he had anything illegal in his luggage, Jackson stated that he had currency in his luggage. Agents asked Jackson if he would consent to a search of his luggage, and Jackson agreed.

24. During the search of Jackson's luggage, agents found $43,010.00 individually wrapped bundles of currency that were in a large vacuum sealed bag. When asked about the way the currency was packaged, Jackson stated that he was coming from the Tennessee area to purchase clothing for his company. (The flight had originated in New Jersey). Agents asked from where Jackson was going to purchase the clothing and Jackson stated "Umm, Los Angeles."

25. Agents advised Jackson that it seemed unusual that a person would not know the name of the company from which he or she was going to be making a large purchase. Jackson stated that his colleague was in charge of ordering and packaging. Jackson eventually admitted that his story did not make sense. When asked if he had any currency on his person, Jackson stated that he did and removed more currency from his person. The currency on Jackson's person was later counted, and totaled $40,000.00.

26. When asked if he had ever been arrested for trafficking narcotics, Jackson admitted that he had previously been arrested and gone to prison for selling cocaine.

Criminal Histories

27. A criminal history check of Feldman revealed that in June 2003, Feldman was arrested for possession of marijuana and, in March 2018, he was arrested for receiving or acquiring proceeds of a controlled substance, or engaging in a transaction involving proceeds, with the intent to conceal or disguise or aid in concealing or disguising the nature, location, ownership, control, or source of the proceeds, and for selling and furnishing marijuana.

28. A criminal history check of Huang revealed that in January 2009, Huang was convicted of criminal possession of a controlled substance; in October 2010, Huang was convicted of driving while impaired by the consumption of alcohol; and in February 2012, Huang was convicted of criminal possession of a controlled substance.

29. A criminal history check of Jackson revealed that in April 1992, Jackson was convicted of criminal possession of narcotics; in May 1992, Jackson was convicted of criminal possession of stolen property; in February 1994, Jackson was convicted of possessing a handgun in a vehicle on a public road; in June 1996, Jackson was convicted of carrying a firearm without a license; in May 2003, Jackson was convicted of possession of marijuana; in June 2003, Jackson was convicted of possession of a controlled substance; in June and July 2003, Jackson was arrested for the sale of a schedule II controlled substance; in March 2005, Jackson was convicted of distribution of crack cocaine; in 2005 Jackson was convicted of distribution of more than five grams of crack cocaine; in April 2014, Jackson was arrested for violating his probation and in April 2015, Jackson's probation was revoked and he was taken into custody; in February 2015, Jackson was convicted of the manufacture, sale or delivery, holding, offering for sale, or

possession of any controlled substance; in June 2015, Jackson was convicted of arson; and in December 2017, Jackson was arrested for theft of services and displaying a counterfeit trademark.

30. The facts above are strongly indicative of illegal drug trafficking activity. Particularly significant are the large amounts of money in the form of currency, being transported by numerous individuals on the same flight. Couriers of drug money use charted planes, as opposed to commercial flights to minimize their potential contact with law enforcement. The packaging of the money is consistent with common practices of drug money couriers, as is the various individuals' lack of knowledge of exactly how much money they were carrying. Also significant were the evasive and inconsistent explanations given for the source and intended use of the money, the fact that all of the individuals traveled to Los Angeles, a source city for illegal drugs, with large blocks of currency, the positive canine alert to the bags containing the defendant funds, indicating that they had been in recent, close proximity to controlled substances, Feldman's fainting when approached by the officers, Huang's possession of personal use quantities of two different controlled substances, the criminal histories of the individuals from whom the money was seized, and the fact that Feldman and Patel admitted that they were to deliver the money to a person they did not know upon arriving in Los Angeles. All of these acts are typical indicators that an individual is transporting proceeds of drug trafficking activity or money intended to be used in one or more exchanges for a controlled substance.

31. Based on the above, plaintiff alleges that the defendant currency represents or is traceable to proceeds of illegal narcotics trafficking, or was intended to be used in one or more exchanges for a controlled substance or listed chemical, in violation of 21 U.S.C. § 841, *et seq*. The defendant currency is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, plaintiff United States of America prays that:

(a) due process issue to enforce the forfeiture of the defendant currency;

(b) due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendant currency to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: June 6, 2019

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

    /s/ Steven R. Welk
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Francisco Avila, hereby declare that:

1. I am a Task Force Officer with the Drug Enforcement Administration and am familiar with this investigation.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents, which I believe to be reliable.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 06 2019 in Los Angeles, California.

*Francisco Avila*
FRANCISCO AVILA

11